IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BETH DUBROW                                :        CIVIL ACTION
                                           :
                                           :
        v.                                 :
                                           :
CITY OF PHILADELPHIA, et al.               :        NO. 07–537

**L. Felipe Restrepo**                                                **August 28, 2008**
**United States Magistrate Judge**

### MEMORANDUM AND ORDER

On February 8, 2007, Plaintiff Beth Dubrow filed this 42 U.S.C. §1983 civil rights action

against Leon A. King II, Commissioner of the Philadelphia Prison System, Rodney

Brockenbrough, a former warden of Philadelphia Industrial Correctional Center (hereinafter

"PICC"), and the City of Philadelphia,[1] see Compl. (Doc. No. 1), seeking compensatory and

punitive damages.

Plaintiff, a former behavior health nurse at PICC, alleges that her substantive due process

right to life, liberty, and bodily integrity guaranteed by the Fourteenth Amendment of the U.S.

Constitution was violated by Defendants when she was sexually assaulted by an inmate on

February 11, 2005.[2]  See Compl. ¶¶ 12-44.  Plaintiff seeks to hold Defendants liable under the

---

[1] Plaintiff also named a "Martha Doe" and ten unknown corrections officers as
defendants.  See Compl. (Doc. No. 1).  At oral argument on June 3, 2008, Plaintiff
withdrew her claims against the unknown Defendants (specifically, a failure to intervene
claim).  See Tr. Oral Arg, 6/3/08, at 3:11-15.  Plaintiff's claims against the afore-
mentioned Defendants are henceforth dismissed with prejudice.

[2] Plaintiff mistakenly brought her Section 1983 claims under the Fourth Amendment (as
well as the Fourteenth Amendment) of the U.S. Constitution.  See Compl. ¶ 44.  At oral
argument, Plaintiff withdrew her Fourth Amendment claim.  See Tr. Oral Arg at 3:19-4:4.
Any Fourth Amendment claims in this case are henceforth dismissed.

"state-created danger" theory.  Plaintiff further seeks to hold the City of Philadelphia liable under Monell v. New York City Dep't of Soc. Servs., 436 U.S 658 (1978).  See Compl. ¶¶ 45-46.

Presently before the Court is Defendants' Motion for Summary Judgment (Doc. No. 21), Plaintiff's Response in Opposition (Doc. No. 22), and Defendants' Reply (Doc. No. 23).  On June 3, 2008, this Court heard oral argument by both parties on Defendants' pending summary judgment motion.  See Tr. Oral Arg., 6/3/08 (Docs. No. 24-25).  On June 9, 2008, the Court issued an Order suspending this case pending disposition of Defendants' Motion.  For the reasons set forth below, the Court now grants Defendants' Motion for Summary Judgment in its entirety.

## I.        BACKGROUND

As is often true of suits brought under the state-created danger theory, the facts of this case are undeniably unfortunate.  In October 2004, Plaintiff Beth Dubrow began employment as a Registered Nurse with Mental Health Management (hereinafter "MHM"), the behavioral health contractor for the Philadelphia Prison System.  See Def. Ex. 2 (Mental Health Management Correctional Servs., Inc. Employment Proposal) at 209.  Ms. Dubrow was subsequently assigned to work at PICC in the maximum security side of the facility.  Pl.'s Mem. Opp. Summ. J. at 5; Pl.'s Ex. H, Dubrow Aff. ¶¶ 3, 6.  Ms. Dubrow received some general safety and security training at the beginning of her employment.  See Dubrow Aff. ¶¶ 4-5; see also Defs.' Ex. 3 (PPS Training Academy Orientation for New Contract Employees).

After a few months working on the maximum security side of the prison, Ms. Dubrow was informed that she would be assigned to work in a new MHM unit on the medium security

side, though her primary duties would remain in the maximum security unit.  Id. ¶ 10.  Her duties

at the new MHM unit were to activate the unit and mentor and assist agency nurses.  See Dubrow

Aff. ¶ 12.

The area in which the new MHM office was located once housed female inmates,  see

Pl.'s Ex. A, Warden Walter Dunleavy, Jr. Dep. at 17-21, but after the construction of a new

women's prison, Riverside Correctional Facility (hereinafter "RCF"), the female inmates were

transferred from PICC to RCF in the spring of 2004, and the warden at PICC and the

Philadelphia Prison System commissioners began to prepare for the area to house male inmates.

See id. at 19-30.

Despite the prison commissioners' general recognition that male inmates are typically

more violent than female inmates, and that female employees at the prison are more vulnerable to

attack from male inmates than female inmates, the structure and security measures in the area

remained largely unchanged.  See id. at 26-29; Pl.'s Ex. B, Warden Rodney Brockenbrough Dep.

at 96-97.  According to Ms. Dubrow, she was never specifically oriented to this new area.  See

Dubrow Aff. ¶ 11.

On February 11, 2005, Ms. Dubrow left the maximum security side of the prison to work

on setting up the new MHM unit.  Id. ¶ 14.  Because the new area had been recently activated,

she did not think there would be any inmates unsupervised and unescorted in the area.  Id. ¶ 15.

Ms. Dubrow accessed the new unit with a key provided to her by prison corrections officers.  Id ¶

17.  Because the door to the new unit looked similar to other doors on the maximum security side

that lock automatically, Ms. Dubrow assumed that the door to the new MHM unit would

automatically lock behind her.[3]  Id. ¶ 21; see Dunleavy Dep. at 33-34.

     Unfortunately, Ms. Dubrow was mistaken.  The door to the MHM office did have a lock that was lockable from the inside, but it did not lock automatically.  See Brockenbrough Dep. at 94-95.  Consequently, Julio Colon, an inmate at PICC who had a prison pass to walk through the new area on his way to church services, entered the unit office after Ms. Dubrow via the unlocked door.  See Pl.'s Mem. Opp Summ. J. at 7; Defs.' Mot. Summ. J. at 4; see also Derrick Bohenek Dep. at 59.  He then approached Ms. Dubrow, reached under sweater, and proceeded to fondle her breasts for several minutes.  See Dubrow. Aff. ¶¶ 24-25.  Because there were no security officers in her line of sight, and no means to signal the security staff from the office, Ms. Dubrow was forced to attempt to de-escalate the situation herself.  See id. ¶ 26.  Finally, after Ms. Dubrow threatened to kick Mr. Colon in the groin and Ms. Dubrow's supervisor, Martha Meadows, came into view, Mr. Colon removed his hands from Ms. Dubrow's breasts and left the office.  See id. ¶¶ 27-29; see also Defs.' Ex. 6 (PA Dep't of Corr. Report of Extraordinary Occurrence, 2/18/05).

     After Mr. Colon left the office, Ms. Dubrow reported the incident to a prison security guard, and Mr. Colon was taken into custody.  See Dubrow Aff. ¶ 30; Defs.' Ex. 6.  The police were notified and took a statement from Ms. Dubrow and completed a police incident report. See Defs.' Ex. 6.

     After the assault on February 11, 2005, the Pennsylvania Department of Corrections and

---

[3]

     According to Ms. Dubrow, no one ever told her that the locking mechanism on this door was not automatic, nor was she provided any training or instruction on the security measures in the medium security side.  See Pls.' Mot. Opp. Summ. J. at 6.

PICC completed an investigation into the incident.  See Defs.' Ex. 6.  In response to the incident, personal body alarms were issued to all MHM employees, MHM staff were instructed to adhere to basic safety and security practices (principally locking doors behind them), and line officers were educated in responding to whistles and the body alarms.  See Def. Ex. 6 at 505.  MHM staff were also permitted to use another office with better sight lines for prison guards to interview inmates, and inmates were prohibited from entering the more secluded office in which Ms. Dubrow was assaulted.  See id.

Ms. Dubrow continued to work at PICC until February 21, 2005, when she became extremely upset and unable to speak at work, allegedly as a response to the trauma of the sexual assault.  See Compl. ¶ 38.  She was taken from PICC to Frankford Hospital and then Friends Hospital, where she was diagnosed with depression and post-traumatic stress, and remained hospitalized for ten days.  See id. ¶ 39.  Ms. Dubrow subsequently resigned from her position at PICC and accepted a workers' compensation settlement of $45,000 from her employer, MHM.  See Defs.' Mot. Summ. J. at 5; see also Defs.' Ex. 2 (Claim Petition for Workers' Comp. et al).  She asserts that she continues to suffer from "severe emotional, psychological, and physical distress" as a result of the assault and is impaired in her ability to seek future employment.  See id. ¶¶ 41-42.

Ms. Dubrow subsequently filed this civil rights suit, alleging that the prison Warden and Commissioner, as well as the City of Philadelphia, violated her substantive due process rights under the Fourteenth Amendment.  Specifically, Ms. Dubrow claims that the Defendants took the following actions:

(1)  providing an office to Ms. Dubrow with inadequate sight lines for correctional officers;

(2)  leaving a traditional locking mechanism on the door rather than replacing it with an automatic locking mechanism;

(3)  failing to inform or train Ms. Dubrow that the door would not automatically lock behind her;

(4)  failing to install a panic button in the office;

(5)  failing to train or instruct her in the security measures in the new unit; and

(6)  inadequately reviewing the new area's security measures during its transfer from female to male inmates, given the more dangerous nature of male inmates;

which failed to provide Ms. Dubrow with a safe working environment, and which caused the assault to occur.  See Pl.'s Mot. Opp. Summ. J. at 12, 18-19; Defs.' Reply at 2.  Further, Ms. Dubrow alleges that these decisions were policy decisions made at the commission level, and that the relevant decision-makers, specifically Commissioner King and Warden Brockenbrough, failed to sufficiently consider the area's security risks to female staff members.  See Pls.' Mot. Opp. Summ. J. at 22.  Finally, Ms. Dubrow alleges that the Commissioner's decisions constituted deliberately indifferent policy-making, for which the City of Philadelphia is liable under Monell v. New York City Dep't of Soc. Servs., 436 U.S 658 (1978).  See Pls.' Mot. Opp. Summ. J. at 23-25.

Defendants argue that all of the alleged inadequacies Ms. Dubrow identifies are mere omissions or, at best, negligence, but are not affirmative acts, and fail to rise to the level of a "state-created danger" under the Due Process Clause.  See Defs. Reply at 3-5.  The individually named Defendants also assert qualified immunity.  See Defs. Mot. Summ. J at 14.

I will address the parties' arguments consistent with the standard set forth below.

6

II.     **SUMMARY JUDGMENT STANDARD OF REVIEW**

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue is one in which the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Anderson, 477 U.S. at 248.

When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-moving party.  Id. at 255; Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005) (citations omitted); see also Crawford v. Beard, 2005 U.S. Dist. LEXIS 887, at *5 (E.D. Pa. Jan. 19, 2005) (citing Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992)).  Thus, summary judgment is appropriate if this Court determines that, after reviewing the evidence and making all inferences in favor of the non-moving party, there is no genuine issue of material fact to warrant a trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

III.    **DISCUSSION**

42 U.S.C. § 1983 provides a remedy against any person who, under color of state law, deprives another of rights protected by the United States Constitution.  See 42 U.S.C. § 1983.[4]

---

[4] Section 1983 states, in relevant part:

> "Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State . . . subjects, or

The threshold issue presented by any Section 1983 case is whether plaintiff has shown a deprivation of a constitutional right. Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992); Brown v. Pa. Dep't of Health Emergency Med. Serv. Training Inst., 318 F.3d 473, 476 (3d Cir. 2003); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1999).

Dubrow alleges that the sexual assault she suffered at the hands on an inmate while working at PICC deprived her of her substantive due process right to bodily integrity under the Fourteenth Amendment. See Compl. Indeed, "individuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment." Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (citing D.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1368 (3d Cir. 1992)).

However, it is well established that the Due Process Clause does not impose an affirmative obligation on a municipality to protect its citizens from private acts of violence. DeShaney v. Winnebago County Dep't of Soc. Serv., 489 U.S. 189, 195-96 (1989); Phillips, 515 F.3d at 235. In DeShaney, the United States Supreme Court stated that the Due Process Clause of the Fourteenth Amendment is a "limitation on the state's power to act, not . . . a guarantee of certain minimal levels of safety and security." 489 U.S. at 195. The intended purpose of the Due Process clause is to prevent the government from abusing its power over private citizens; its

---

causes to be subjected, an citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .."

42 U.S.C. § 1983.

8

purpose is not to ensure that the state protects private citizens from one another.  Id. at 196

("[The Due Process Clause's] purpose was to protect the people from the State, not to ensure that

the State protected them from each other.").[5]  I note that both the Supreme Court and the Third

Circuit have repeatedly cautioned federal courts to exercise utmost restraint when asked to

recognize individual rights under the Due Process Clause that extend beyond its intended

purpose.  See, e.g., DeShaney, 489 U.S. at 195; Collins, 503 U.S. at 125; Bennett v. City of

Philadelphia, 499 F.3d 281, 287, 289-90 (3d Cir. 2007); Kaucher v. County of Bucks, 455 F.3d

418, 428 n.5 (3d Cir. 2006).

It is also well established that the Due Process Clause does not impose an affirmative

obligation on municipal employers to provide a safe working environment for municipal

employees.  See Collins, 503 U.S. at 126.  In Collins v. City of Harker Heights, the Supreme

Court explained that state law, rather than the federal Constitution, generally governs

---

[5]        Because this case occurs within the context of a prison, it is important to
distinguish the constitutional rights of prisoners from those of the employees who work
there.
        The Eighth Amendment imposes an affirmative duty on the state to provide safe
and humane conditions, adequate food, shelter, clothing, and medical care to prisoners.
See Farmer v. Brennan, 511 U.S. 825, 832-33 (1994); DeShaney, 489 U.S. at 198 (citing
Estelle v. Gamble, 429 U.S. 97 (1976) and Robinson v. California, 370 U.S. 660 (1962));
see also Youngberg v. Romeo, 457 U.S. 307 (1982) (holding that the Due Process Clause
also requires the state to provide involuntarily committed mental patients with a safe
environment).  Because the state's act of taking physical custody of a prisoner creates a
"special relationship" within the context of the Due Process Clause, the afore-mentioned
duty of care the state owes to a prisoner is an exception to the rule set forth in Deshaney.
See Sanford, 456 F.3d at 304 n.4.  This duty encompasses prisons' obligation to take
reasonable steps to protect prisoners from harming one another.  See Farmer, 511 U.S. at
833-35.  Because Ms. Dubrow was an employee of the prison, not an inmate, a "special
relationship" does not exist in this case.  See infra.

employment relationships, and failures on the part of government employers to provide a working environment "free of unreasonable risks of harm" is governed by state tort law, not the Due Process Clause.  <u>See</u> <u>id.</u> at 126-30 ("the Due Process Clause does not impose an independent federal obligation upon municipalities to provide certain minimal levels of safety and security in the workplace . . . .").  The Supreme Court has also explained that "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of care arising out of tort law.  Remedies for the latter type of injury must be sought in state court under traditional tort-law principles."  <u>See</u> <u>Baker v. McCollan</u>, 443 U.S. 137, 146 (1979).  Hence, conduct by a municipal employer that is merely negligent may be actionable in a state forum, but it cannot form the basis of an award of damages under 42 U.S.C. § 1983.  <u>See</u> <u>Baker</u>, 443 U.S. at 138-47.

Apparently recognizing that a mere allegation that the City and its commissioners failed to provide her with a safe workplace would not constitute a cognizable claim under the Due Process Clause—and Section 1983[6]—Ms. Dubrow brings this case under the "state-created danger theory" of liability, <u>see</u> Compl. ¶¶ 43-44,  an exception to <u>DeShaney</u>'s general rule that the Due Process Clause does not impose an affirmative duty upon the State to protect citizens from the acts of private individuals.  <u>See</u> <u>Ye v. United States</u>, 484 F.3d 634, 637 (3d Cir. 2007); <u>Sanford v. Stiles</u>, 456 F.3d 298, 304-05 (3d Cir. 2006); <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1201 (3d Cir. 1996).

In essence, the "state-created danger" theory establishes liability where the "state acts to

_____

[6] <u>See</u> <u>Ye v. United States</u>, 484 F.3d 634, 638 (3d Cir. 2007) (noting that <u>DeShaney</u> holds that "a state's failure to take affirmative action to protect a victim from the actions of a third party will not, in the absence of a custodial relationship . . . support a civil rights claim.") (internal citations omitted).

create or enhance a danger that deprives the plaintiff of his or her Fourteenth Amendment right to

substantive due process." Kneipp v. Tedder, 95 F.3d at 1205; see also Brown, 318 F.3d at 478;

Scheiber v. City of Philadelphia, 320 F.3d 409, 416 (3d Cir. 2003).  Although the Supreme Court

has not explicitly adopted the "state-created danger" theory, it is now widely recognized in the

Third Circuit and many of its sister circuits.  See Sanford, 456 F.3d at 304 n.5 (collecting cases).

To prevail on a state-created danger claim in the Third Circuit, a plaintiff must prove each

element of the following four-pronged test:

> (1) the harm ultimately caused was foreseeable and fairly direct;
> (2) a state actor acted with a degree of culpability that shocks the
>     conscience;
> (3) a relationship between the state and the plaintiff existed such that
>     the plaintiff was a foreseeable victim of the defendant's acts, or a
>     member of a discrete class of person subjected to the potential
>     harm brought about by the state's actions, as opposed to a member
>     of the public in general;
> (4) a state actor affirmatively used his or her authority in a way that
>     created a danger to the citizen or that rendered the citizen more
>     vulnerable to danger than had the state not acted at all.

Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006) (internal quotations and

footnotes omitted); see also Ye, 484 F.3d at 638; Sanford, 456 F.3d at 304-05.

While the parties have provided the Court with arguments regarding the first and third

prongs, I need not address them because I find that Ms. Dubrow cannot satisfy the second and

fourth prongs, namely that the Defendants acted in a manner that "shocks the conscience," and

that Defendants affirmatively acted to put Ms. Dubrow in danger.  See Bright, 443 F.3d at 281;

see also Phillips, 515 F.3d at 235-36; Crawford, 2005 U.S. Dist. LEXIS 887, at *7 (finding that

plaintiff's failure to satisfy the fourth prong and the "shocks the consciousness" test was

sufficient to grant summary judgment to defendants).

a.     *The "Shocks the Conscience" Test*

The second prong of the state-created danger test requires the plaintiff to show that "a state actor acted with a degree of culpability that shocks the conscience."  Bright, 443 F.3d at 281.  In Schieber v. City of Philadelphia, the Third Circuit adopted the Supreme Court's interpretation of the "shocks the conscience" standard as announced in County of Sacramento v. Lewis, 523 U.S. 833 (1998).  See Schieber, 320 F.3d 409, 417-423.

In County of Sacramento v. Lewis, the Supreme Court explained that "the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."  523 U.S. 833, 845 (1998).  However, the "degree of wrongfulness necessary to reach the conscience-shocking level depends upon the circumstances of a particular case," Kaucher, 455 F.3d at 426 (citing Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999)), specifically the length of time a defendant had to act, and the urgency of the conditions with which a defendant was confronted. See Kaucher, 455 F.3d at 426.

In this case, both parties characterize Defendants' decisions regarding the safety measures at PICC as having taken place over a period of numerous years, perhaps even as far back as 1985. See Tr. Oral Arg. at 42.  Under such circumstances, where Defendants had numerous years to respond to safety concerns at PICC, "deliberate indifference" may be the appropriate measure of what "shocks the conscience."  See Kaucher, 455 F.3d at 426-27 (quoting Estate of Smith v. Marasco (Smith II), 430 F.3d 140, 153 (3d Cir. 2005)) ("Where a defendant has the 'luxury of

12

proceeding in a deliberate fashion . . . deliberate indifference may be sufficient to shock the conscience.'"). The parties agree that deliberate indifference is the proper standard under the second prong of the state-created danger test, see Tr. Oral Arg. at 4:5-9, and therefore I shall analyze Defendants' actions under that standard of culpability.

After carefully reviewing the record in the light most favorable to Plaintiff, I conclude that Defendants' conduct does not amount to deliberate indifference.

Plaintiff essentially alleges that the cumulative effect of numerous, independently-made decisions by Defendants over several years amounted to a situation in which Ms. Dubrow was more likely to be assaulted by an inmate.  See Tr. Oral Arg. at 41-42.  Specifically, Plaintiff argues that I should find that the following decisions amounted to deliberate indifference:

- deciding to place Ms. Dubrow in the office where she was assaulted, despite its poor sight lines to corrections officers and lack of a panic button;
- deciding to switch the area from female inmates to male inmates without conducting a safety audit;
- deciding not to replace the traditional lock on the door with an automatic lock;
- deciding what training Ms. Dubrow should receive with regard to security, which Ms. Dubrow alleges was inadequate.

In order to find that these "decisions" amounted to deliberate indifference, I must find that Defendants consciously disregarded a great risk of serious harm rather than a substantial risk. See, e.g., Sanford, 456 F.3d at 310 (discussing the evolution of the meaning of "deliberate indifference" in Third Circuit case law in the context of state-created danger cases).  I do not.

It is clear from the record that the door to the office in which Ms. Dubrow was assaulted was equipped with a lock, though it was not an automatic lock.  If Ms. Dubrow had utilized this safety measure available to her, no inmate would have been able to access the office where Ms.

Dubrow was working, regardless of whether the inmate were male or female.  Though the lock

on the door in question was not automatic, as were those on the maximum security side, this door

was in a medium security area.  I note that one of the precautions taken by PICC after Ms.

Dubrow's assault was to educate MHM workers on the importance of closing and locking doors

behind them in areas where inmates would pass through.  It is highly likely that even if a panic

button had been installed in the office, or Ms. Dubrow had been afforded the benefit of personal

body alarm and whistle, Mr. Colon would still have been able to access the office and assault Ms.

Dubrow as long as the door remained unlocked because Ms. Dubrow did not lock it.

In hindsight, one might surmise that, in anticipation of possible confusion on the part of

employees switching from the maximum security side to the medium security side, the prison

should have advised Ms. Dubrow of the differing locking mechanisms.  However, there is no

evidence, nor does Dubrow allege, that Defendants affirmatively misled her as to the substantial

risks of her workplace.  "Plaintiff does not establish that the state must warn its employees of all

risks in the workplace . . ." or else risk Section 1983 liability.  See Uhlrig v. Harder, 64 F.3d 567

(10th Cir. 1995).

At most, such conduct amounts to negligence.  However, "indefensible passivity" and

"nonfeasance" do not rise to the level of a constitutional violation.  See Brown, 318 F.3d at 479

(citing D.R., 972 F.2d at 1376).  One might also plausibly argue that Defendants exercised poor

judgment in their choice of MHM office, and thus the Defendants are further guilty of

negligence.  See Schieber, 320 F.3d at 421.  However, "liability for negligently inflicted harm is

categorically beneath the threshold of constitutional due process."  See Lewis, 523 U.S. at 849;

see also Daniels v. Williams, 474 U.S. 327, 328 (1986).  Though Defendants might certainly

14

have done more to provide a safer working environment for Ms. Dubrow, they are not, as previously discussed, obligated to do so under the Due Process Clause.

Because I do not find that Defendants' failure to provide an automatic lock, or inform Ms. Dubrow that the lock was not automatic, in addition to their other decisions regarding the usage and security measures in the relevant area of PICC, reaches the level of deliberate indifference, I find that Plaintiff has not created a material issue of fact with regard to the second prong of the state-created danger test.

b. *The Affirmative Act Requirement*

Given that Ms. Dubrow has failed to show the requisite level of culpability, her claim cannot succeed. However, I also note that she fails to create a material issue of fact with regard to the fourth prong of the state-created danger test, which requires a plaintiff to prove that a state actor used his or her authority to create an opportunity that otherwise would not have existed for the third-party's crime to occur. See Phillips, 515 F.3d at 235 (citing Kneipp, 95 F.3d at 1208). In this case, Ms. Dubrow cannot show that the Defendants used their authority to create an opportunity for Mr. Colon (or any inmate) to assault Ms. Dubrow that would not have existed absent their intervention.

Despite her attempts to recast Defendants' "failures" to perform certain security checks and install certain security precautions as affirmative acts, they are more properly categorized as omissions or failures to act. See Defs.' Reply at 3-4. The Third Circuit has made it clear that only a "misuse of state authority, rather than a failure to use it, can violate the Due Process Clause." Bright, 443 F.3d at 282; see also Phillips, 515 F.3d at 236 (finding that a plaintiff must

allege an affirmative action, rather than an inaction or omission).

In support of her argument, Plaintiff cites Marvel v. Delaware County, 2008 U.S. Dist. LEXIS 29762 (E.D. Pa. Apr. 11, 2008).  I note that the opinion cited by Plaintiff is a denial of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and is therefore of limited value in this case.  However, its factual circumstances are instructive.

In Marvel, the plaintiff received a citation for a violation of open container laws and other offenses in Delaware County.  See Marvel, 2008 U.S. Dist. LEXIS 29762, at *1.  He was accepted into Delaware County's Accelerated Rehabilitative Disposition ("ARD") program, a pre-trial diversionary program, for which he was required to complete community service.  See id. at *2-3.  On August 1, 2006, Marvel assisted with the construction of a two-story scaffold.  Id. at *3.  The National Weather Service had issued an excessive heat warning for Delaware County the day before, to remain in effect until August 3, 2006.  Despite the extreme heat, the community service workers were only provided with one water cooler, and ran out of water during the day.  Id. at *2-3.  While unloading cinder blocks in the direct sunlight, Marvel became ill.  Id.  He was transported to Mercy Fitzgerald Hospital, where he was pronounced dead of cardiac arrest.  Id.  The workers' supervisor, though informed of Marvel's death, nonetheless required the remaining workers' to labor through the intense heat, until they demanded to go home.  Id. at *4.

Marvel's surviving spouse then sued Delaware County under the state-created danger theory. This Court declined to grant Delaware County's motion to dismiss, finding that Marvel had sufficiently pled an affirmative act, namely the county's requiring him to work at a construction site in excessive heat in order to satisfy his ARD requirements.  See id. at *20.  This Court

16

explained that by assigning fifty-nine year old Marvel to heavy labor community service in excessive heat, the defendants had created a situation in which Marvel was at an enhanced risk for heat-related cardiac arrest.  Id.  The Court found that Marvel's allegations were sufficient to plead an affirmative action under the rubric of a state-created danger.  Id. at *21.

Analogously, in the now well-known case of Kneipp v. Tedder, the Third Circuit also found that the plaintiff had shown an affirmative act on the part of a state actor.  In Kneipp, the police stopped a couple on the street in the middle of the night for creating a disturbance.  The wife was intoxicated to the point of being unable to walk unassisted.  While the police detained both of them, they subsequently allowed the husband to go home and continued to detain the wife.  The husband left, assuming that the police would take his wife either to the police station or the hospital.  Rather, the police sent the wife home alone, resulting in her falling into a ditch and sustaining serious injury.  In Kneipp, the Third Circuit found, on the basis of such actions, that the police "used their authority as police officers to create a dangerous situation or to make the wife more vulnerable to danger than had they not intervened."  See Bright, 443 F.3d at 282-83 (quoting Kneipp, 95 F.3d at 1209).[7]

---

[7]  L.W. v. Grubbs, 974 F.2d 119 (9th Cir. 1992), a Ninth Circuit case, is also an instructive case to contrast with the instant case because of its similar factual circumstances.  In Grubbs, the plaintiff was a registered nurse employed by the State of Oregon at a medium security prison for young male offenders.  974 F.2d at 120.  According to plaintiff's complaint, the defendants hired her to work in the prison's medical clinic and led her to believe that she would not be required to work alone with violent sex offenders.  Id.  However, the defendants selected an inmate, David Blehm, to work with the plaintiff alone in the clinic.  Id.  According to his file, Blehn was considered "very likely to commit a violent crime" if placed alone with a female.  Id.  Once alone with the plaintiff, Blehm assaulted, battered, kidnapped, terrorized, and raped the plaintiff.  Id.

        The Ninth Circuit found that the plaintiff had sufficiently alleged affirmative conduct on the part of the Defendant created the particular danger that exposed her to the

Considering the actions by the defendants in <u>Marvel</u> and <u>Kneipp</u>, it is clear (contrary to Plaintiff's assertion with regard to <u>Marvel</u>) that no analogous affirmative act exists in this case. Unlike Marvel's community service for Delaware County, Ms. Dubrow worked at PICC entirely of her own volition.  Unlike in <u>Kneipp</u>, the prison did not intervene in the ordinary course of Ms. Dubrow's work duties to place her in a situation of heightened danger.  Though Ms. Dubrow was assigned to work in a medium security area for part of her employment hours, this action on the part of MHM did not put Ms. Dubrow at any heightened risk of attack that she would not have been exposed to otherwise as a prison nurse working in maximum security conditions.  To the contrary, PICC provided her with a locked office; it was Ms. Dubrow's decision either not to lock the door behind her or not to investigate its locking mechanism.

Plaintiff repeatedly characterizes the decisions by the Warden and Commissioner not to provide certain safety precautions in that specific area of PICC as policy decisions and affirmative acts.  However, such verbal recasting does not change the fact that Plaintiff is actually

---

third-party violence because they had assigned Blehm to work with the plaintiff despite their knowledge that Blehm had an extensive history of violence against women, that he was highly likely to re-offend if given the opportunity, that he would be alone with the plaintiff on numerous occasions because of the work assignment, and because they knew the plaintiff would not be prepared to fend off his attack because she was not informed that she would be working one-on-one with violent offenders. <u>Id.</u> at 121-22.  The Ninth Circuit deemed the defendants' affirmative act to be sufficient to support Section 1983 liability.

In <u>Grubbs</u>, the defendants clearly made a decision to alter the plaintiff's circumstances in the prison by actively assigning a sexually-violent offender to work with her alone, despite their knowledge of the significant risk of danger and their failure to warn the plaintiff.  There is no analogous affirmative act in the instant case.  Rather, the unfortunate assault on Ms. Dubrow essentially occurred within the regular course of business at the prison.  While there were always risks associated with Ms. Dubrow's position at the prison, the instant Defendants did not affirmatively act to increase that risk, as the defendants in <u>Grubbs</u> so plainly did.

alleging failures to act, which cannot form the basis of a Due Process violation.  "State actors cannot use their authority to create [] an opportunity [for harm] by failing to act."  Bright, 443 F.3d at 283 n.6 (internal citations omitted).

Further, the Fourth Circuit, in interpreting Collins v. City of Harker Heights, recently stated that Collins stands for the proposition that "decisions about how to allocate resources in state government involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country." See Waybright v. Frederick County, 2008 U.S. App. LEXIS 11755, at *11 (4th Cir. Md. Jun. 2, 2008).  Were this Court to invoke the Due Process Clause to intervene in the policy choices of locally-appointed prison officials, it would "transmute[] ordinary torts against the government into Fourteenth Amendment claims." Waybright, 2008 U.S. App. LEXIS 11755, at *11 (citing Paul v. Davis, 424 U.S. 693,  698-99 (1976)).

In sum, because Plaintiff's claim is essentially a negligence action under state tort law dressed up as a state-created danger claim, I must grant summary judgment to Defendants on Plaintiff's Count I.


c.  Monell Claim

Because I have determined that there was no constitutional violation in this case, Plaintiff's Monell claim cannot be sent to a jury for resolution.  See Monell, 436 U.S. at 691-92; Brown, 318 F.3d at 482 (citing Collins, 503 U.S. at 121) (finding that "for there to be municipal liability, there still must be a violation of plaintiff's constitutional rights."); see also Crawford,

2005 U.S. Dist. LEXIS 887, at *13.[8]  At oral argument, Plaintiff recognized that without a constitutional violation, there can be no Monell liability on the part of the City of Philadelphia. See Tr. Oral Arg. at 19:5-10.  Accordingly, summary judgment is properly granted to Defendants on Plaintiff's Monell claim.


## IV.      CONCLUSION

As this Court stated in Kepner v. Houstoun, 164 F. Supp. 2d 494, 501 (E.D. Pa. 2001), "it goes without saying that we sympathize" with Ms. Dubrow, who has undoubtedly suffered a traumatic experience at the hands of Mr. Colon.  "Nonetheless, we cannot allow our sympathies to prevent us from following the law."  See Kepner, 164 F. Supp. 2d at 501.

Although Ms. Dubrow seeks a remedy that the federal courts, as interpreters of the United States Constitution, are unable to grant, I note that she is not left empty-handed.  Rather, Ms. Dubrow received a settlement under state workers' compensation, presumptively as compensation for whatever degree her employer's negligence contributed to her injuries.  Given that her claims sound in state tort law, this outcome is appropriate.

Accordingly, because I find that Ms. Dubrow fails to satisfy the second and fourth prongs of the state-created danger test, namely that the state acted with deliberate indifference and that the state affirmatively acted to put her in danger, I grant summary judgment to Defendants on Plaintiff's state-created danger claim.  Consequently, I grant summary judgment to Defendants on Plaintiff's Monell claim.

---

[8]  Because I have concluded that no constitutional violation occurred, I need not reach the qualified immunity issue.  See, e.g., Schieber, 320 F.3d at 423.

My Order follows.